## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM ALLEN PARKER,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-cv-00274-MHH** |
| | } | |
| | } | |
| **CSX TRANSPORTATION, INC.,** | | |
| | | |
| **Defendant.** | | |

## MEMORANDUM OPINION

This case concerns the Family Medical Leave Act, which gives an eligible employee "a total of 12 workweeks of leave during any 12–month period" to, among other things, care for his spouse "if such spouse . . . has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).  To protect an employee's right to use FMLA leave, "the FMLA creates two types of claims:  interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act ... [,] and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the

1

Act." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).

At its core, this is an FMLA retaliation case. William Parker is one of dozens of employees who CSX Transportation, a freight railroad, disciplined after the employees used FMLA leave over the holidays between December 24, 2017 and January 1, 2018. For several years, CSX approved Mr. Parker's requests for intermittent FMLA leave to care for his wife. "Eligible employees may take FMLA leave on an intermittent or reduced schedule basis when medically necessary due to the serious health condition of a covered family member or the employee or the serious injury or illness of a covered servicemember." 29 C.F.R. § 825.203. CSX has a legitimate interest in ensuring that its employees use intermittent leave properly. Mr. Parker and other CSX conductors and engineers are on-call 24/7; holidays are no exception. When a conductor uses FMLA leave, another conductor must take his place. On-call employees who use intermittent FMLA leave on a holiday cause CSX to have to call to duty other employees who otherwise would have had the holiday free, and excessive absences can cause trains to run behind schedule.

CSX found that Mr. Parker dishonestly used his approved intermittent FMLA leave in 2017 on December 24, 25, and 31 so that he could avoid working over the holidays. CSX fired Mr. Parker for his misuse of FMLA leave at Christmas. Then,

the company fired him again for misuse of FMLA leave over the New Year's holiday.

The evidence in the record, viewed in the light most favorable to Mr. Parker, demonstrates that his use of intermittent FMLA leave over the 2017-18 holiday season was legitimate, but for purposes of Mr. Parker's FMLA retaliation claim, that is neither here nor there. To avoid summary judgment on his FMLA retaliation claim, Mr. Parker must present evidence that undermines CSX's assertion that, based on its investigation, it believed in good faith that Mr. Parker misused FMLA leave between December 24, 2017 and January 1, 2018.

During a hearing on CSX's summary judgment motion, the Court discussed evidence from which jurors could conclude that the process CSX used to make its employment decision was deeply flawed. Relying on the Eleventh Circuit Court of Appeals' decision in *E.E.O.C. v. Total System Servs., Inc.*, 221 F.3d 1171 (11th Cir. 2000), the Court indicated during the hearing that it did not believe that Mr. Parker could contradict CSX's assertion of good faith in its investigation simply by demonstrating that the investigation process was not sound. (Doc. 55, pp. 59–60). Having examined the evidence concerning that process more closely and having reviewed *Total System* and authority concerning the "good faith" standard in other employment contexts, the Court finds that significant flaws in a company's evaluation of its employee's exercise of his FMLA rights can create a disputed issue

of fact concerning the company's exercise of good faith in reaching an adverse employment decision. In other words, if an employee produces evidence that establishes that his employer's FMLA leave verification system was broken by design and produced unreliable information, then an employer cannot, as a matter of law, believe in good faith that it had a legitimate basis for disciplining the employee for his use of authorized FMLA leave.

This opinion addresses Mr. Parker's FMLA retaliation claim and several other claims that relate to his use of FMLA leave during the 2017-18 holiday season. The opinion is organized in three sections. First, the Court outlines the standard for a Rule 56 motion for summary judgment. Then, the Court discusses the evidence concerning Mr. Parker's FMLA use in 2017 and CSX's decision to terminate him. Finally, the Court identifies the legal standards that govern Mr. Parker's FMLA and state law claims and examines the evidence under those standards. Because the Court has reconsidered its initial ruling on Mr. Parker's FMLA retaliation claim *sua sponte* and because of the length of time that has passed since the parties briefed CSX's summary judgment motion, at the end of the opinion, the Court will offer the parties the option to file supplemental briefs to discuss the FMLA retaliation analysis that appears below.

# I.

Under Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court views the summary judgment evidence in the light most favorable to Mr. Parker.

## II.

Mr. Parker began working for CSX in 2003. He served as a conductor, switchman, brakeman, RCO, and retarder operator. (Doc. 44-1, p. 5, tpp. 12–13).[1] In December 2017, Mr. Parker was working as a conductor out of CSX's Bessemer, Alabama railyard. (Doc. 44-1, p. 5, tp. 13). CSX trains run 365 days per year, and CSX conductors and engineers are on-call 24/7. When a CSX employee takes FMLA leave, other employees must cover the work to avoid disruption to operations and train delays. (Doc. 44-23, p. 19) (November 21, 2017 bulletin to CSX employees). To be fair to all employees, CSX must ensure that employees who have qualified for intermittent FMLA leave do not misuse leave over holidays.

Mr. Parker first qualified for intermittent FMLA leave late in 2015. (Doc. 37-3, p. 12, tp. 39; Doc. 37-3, pp. 59, 62).[2] Mr. Parker applied for FMLA leave because

---

[1] UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL RAILROAD ADMINISTRATION, *Remote Control Locomotive Operations: Results of Focus Groups with Remote Control Operators in the United States and Canada*, May 2006, at p. v https://railroads.dot.gov/sites/fra.dot.gov/files/fra_net/1204/ord0608.pdf (RCOs or Remote Control Operators "on Class I railroads are generally switchmen who receive special training to become RCOs[.]").

[2] Mr. Parker applied for intermittent FMLA leave on September 24, 2015. (Doc. 37-3, pp. 58–61). Mrs. Parker's physician indicated that she needed care and transportation between September 24, 2015 and October 2, 2015 and that she would need Mr. Parker's help over the ensuing year four to six times for approximately five days at a time. (Doc. 37-3, p. 61). Mr. Parker testified that CSX approved his 2015 application for intermittent FMLA leave, (Doc. 37-3, p. 12, tp. 39), but the record does not seem to capture the first and last date of the 12-month period for which CSX approved intermittent leave. It is reasonable to infer that the authorized 12-month period began in September of 2015 and ended one year later.

his wife suffers from dysautonomia and postural orthostatic tachycardia syndrome or POTS.[3]  In support of his 2015 application for FMLA leave, Mr. Parker submitted a certification from Mrs. Parker's healthcare provider.  Mrs. Parker's physician wrote: "Patient will need supportive care and transportation during episodes."  (Doc. 37-3, p. 61).

---

[3]  CLEVELAND CLINIC, DYSAUTONOMIA, https://my.clevelandclinic.org/health/articles/6004-dysautonomia (last visited Sept. 15, 2020) ("Dysautonomia refers to a disorder of autonomic nervous system (ANS) function that generally involves failure of the sympathetic or parasympathetic components of the ANS, but dysautonomia involving excessive or overactive ANS actions also can occur.")

CLEVELAND CLINIC, POSTURAL ORTHOSTATIC TACHYCARDIA SYNDROME (POTS), https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots (last visited Sept. 15, 2020) ("POTS is a condition that affects circulation (blood flow).  POTS is a form of orthostatic intolerance, the development of symptoms that come on when standing up from a reclining position, and that may be relieved by sitting or lying back down. The primary symptom of an orthostatic intolerance is lightheadedness, fainting and an uncomfortable, rapid increase in heartbeat.").

Initially, Mrs. Parker's physician diagnosed positional vertigo and migraines.  (Doc. 37-3, p. 11, tpp. 36–37; Doc. 37-3, p. 60).  Later, Mrs. Parker was diagnosed with dysautonomia and POTS. (Doc. 37-3, p. 63).

Mrs. Parker explained her illness as "an autoimmune issue that affects [her] heart, I actually have really low blood pressure, but I also have very high heartbeat, like my heart palpitates, it's a constant sense of vertigo with headaches, vomiting, nauseousness, just -- it's just a -- an all-around heart -- it's really like my heart, my heart will palpitate, and -- and my world kind of spins.  And it -- there's no reason.  It just happens.  I could literally be sitting at my desk doing nothing, and my heart will start to race."  (Doc. 44-4, p. 3, tp. 5).

During his first 12-month period of intermittent FMLA leave, Mr. Parker took leave on the following dates:

December 18, 2015 (7:37 p.m.)—December 19, 2015 (9:51 p.m.)

December 20, 2015 (5:15 p.m.)—December 22, 2015 (10:49 a.m.)

**December 24, 2015 (10:50 a.m.)—December 25, 2015 (11:17 p.m.)**

March 12, 2016 (7:14 p.m.)—March 14, 2016 (7:38 a.m.)

March 18, 2016 (11:18 p.m.)—March 20, 2016 (4:28 p.m.)

April 8, 2016 (9:00 p.m.)—April 9, 2016 (11:20 a.m.)

April 16, 2016 (11:10 a.m.)—April 17, 2016 (10:20 a.m.)

April 22, 2016 (10:35 a.m.)—April 23, 2016 (3:14 p.m.)

April 30, 2016 (12:51 p.m.)—May 1, 2016 (6:33 a.m.)

May 6, 2016 (9:20 a.m.)—**May 8, 2016 (2:24 p.m.)**

June 4, 2016 (12:01 a.m.)—June 5, 2016 (8:43 p.m.)

June 11, 2016 (9:39 p.m.)—June 13, 2016 (10:01 p.m.)

**June 19, 2016 (2:57 a.m.)—June 19, 2016 (11:51 p.m.)**

July 22, 2016 (11:08 p.m.)—July 25, 2016 (10:37 p.m.)

July 29, 2016 (10:50 p.m.)—August 1, 2016 (8:45 a.m.)

August 20, 2016 (8:28 p.m.)—August 22, 2016 (9:51 p.m.)

August 26, 2016 (10:15 p.m.)—August 29, 2016 (5:49 a.m.)

(Doc. 37-3, pp. 68, 75–76). December 24, 2015 was Christmas Eve, and December 25, 2015 was Christmas Day. May 8, 2016 was Mother's Day, and June 19, 2016 was Father's Day. (*see* Doc. 37-3, p. 75). These holidays are highlighted on the list

above.  Otherwise, according to CSX's records, Mr. Parker's many days of FMLA leave during his first 12-month period of intermittent leave did not fall on holidays.[4]

CSX approved Mr. Parker for a second 12-month period of intermittent FMLA leave from September 16, 2016 to September 16, 2017.  (Doc. 44-3, p. 76).  In an October 2016 letter, CSX warned Mr. Parker that he was using his approved FMLA leave too frequently "on the weekends or in conjunction with other days off (i.e. rest days, personal days, vacation, sick days)."  (Doc. 37-3, p. 74).  In March of 2017, after Mr. Parker used approved FMLA leave over the Martin Luther King, Jr. and Super Bowl weekends, CSX again advised Mr. Parker that the company had noticed an "established pattern of marking off FMLA leave on the weekends, in conjunction with other days off (i.e. rest days, vacation days, etc.), holidays or other pattern . . . ."  (Doc. 37-2, p. 25).  The March 2017 warning was a "**final warning**" in which CSX stated that if Mr. Parker "continue[d] misusing FMLA," he might "be subject to a charge and formal disciplinary handling.  The Company will continue to monitor your FMLA mark offs."  (Doc. 37-2, p. 25) (emphasis in CSX document).

---

[4] It is difficult to track Mr. Parker's FMLA leave because the parties placed only parts of different records of Mr. Parker's FMLA leave in the record.  *See, e.g.*, Doc. 37-2, p. 8 (Ms. Johnson explaining that she provided "excerpts of Mr. Parker's work history report" showing his FMLA usage from 2015 forward), and *compare* Doc. 37-2, pp. 28–33 *with* Doc. 37-4, pp. 75–76.  The Court has not found in the record a complete report of Mr. Parker's FMLA usage from 2015 forward.  The FMLA records that Mr. Parker submitted in opposition to CSX's motion for summary judgment are more complete than the records CSX filed.  Mr. Parker's submission, Doc. 44-5, provides a full count of the days of FMLA leave that Mr. Parker used during the relevant 12-month period that began in June of 2017.

In the two warning letters, CSX offered no corroborating evidence to support its contention that Mr. Parker was misusing FMLA leave. CSX simply equated the use of FMLA leave on a holiday as FMLA misuse. CSX explained to Mr. Parker that "[i]f there are extenuating circumstances that may support your pattern use described in this letter, you may provide Ms. Johnson with supporting documentation by emailing the information to her . . . ." (Doc. 37-2, p. 25).

CSX did not single Mr. Parker out for criticism. In an August 2016 letter to its employees, CSX warned that "[u]sing FMLA leave to avoid certain work assignments" or "to be off on a holiday" was "considered not only misuse, but fraudulent use of this federally required benefit." (Doc. 44-23, p. 16). CSX advised its employees that, "[g]oing forward," the company would be "diligently monitoring employee FMLA usage to identify and address, through disciplinary measures, those who misuse this benefit." CSX encouraged employees who were aware of instances of misuse of FMLA leave "to report it to [their] supervisor or Jolanda Johnson, Manager Benefits-FMLA." (Doc. 44-23, p. 16). On November 21, 2017, CSX again warned its employees that it "[would] not allow FMLA to be misused" and urged employees to report misuse to Ms. Johnson. (Doc. 44-23, p. 19). CSX's records show that on holidays and overall, significantly fewer CSX employees used FMLA leave in 2017 as compared to 2016. *Compare* Doc. 44-3, p. 18 *and* Doc. 44-3, p. 19.

When Mr. Parker reapplied for FMLA leave in June of 2017, Mrs. Parker's physician certified that Mrs. Parker's condition was chronic; that she suffered from "dizziness & vertigo" and "cardiac palpitations and tachycardia;" that episodes of dysautonomia and POTS could last 48 to 72 hours; and that during episodes, Mr. Parker would have to help Mrs. Parker stand, walk, and drive. (Doc. 37-3, pp. 63–64). Mrs. Parker's physician, Dr. Paula Moore, certified that Mr. Parker's request for FMLA leave was "related to a serious health condition of employee's spouse." The Parkers authorized CSX to contact Dr. Moore "to obtain clarification" of the physician's medical certification. (Doc. 37-3, pp. 63–64; Doc. 37-9, pp. 13–18). CSX approved the application and certified Mr. Parker for 12 workweeks of intermittent leave between June 27, 2017 and June 26, 2018, to be used for "1-3 episodes per week, up to 3 days per episode, and 2 office visits per year." (Doc. 37-3, p. 65).

Between June 27, 2017 and December 22, 2017, Mr. Parker used intermittent FMLA leave on the following dates:

> July 13, 2017 (10:58 p.m.)—July 14, 2017 (10:58 a.m.)
> July 29, 2017 (11:27 p.m.)—July 31, 2017 (7:40 a.m.)
> August 5, 2017 (2:22 p.m.)—August 7, 2017 (12:57 p.m.)
> August 10, 2017 (9:32 p.m.)—August 12, 2017 (12:07 p.m.)
> September 1, 2017 (10:01 p.m.)—September 3, 2017 (10:06 a.m.)

September 28, 2017 (11:42 p.m.)—September 30, 2017 (10:14 p.m.)

October 17, 2017 (5:34 p.m.)—October 18, 2017 (9:30 a.m.)[5]

October 30, 2017 (9:47 p.m.)—**October 31**—November 1, 2017 (7:50 a.m.)

November 3, 2017 (3:53 p.m.)—November 6, 2017 (8:13 a.m.)

**November 11, 2017 (3:19 a.m.)**—November 12, 2017 (2:15 p.m.)

November 18, 2017 (12:44 a.m.)—November 19, 2017 (7:25 a.m.)

November 22, 2017 (10:55 p.m.)—**November 23, 2017 (9:38 p.m.)**

November 30, 2017 (11:50 a.m.)—December 4, 2017 (7:13 a.m.)

December 6, 2017 (8:39 a.m.)—December 7, 2017 (5:21 a.m.)

December 16, 2017 (8:39 p.m.)—December 18, 2017 (7:28 a.m.)

(Doc. 37-2, pp. 30–31, 35; Doc. 37-12, p. 6; Doc. 44-5, pp. 4, 6, 7, 9, 12, 13, 15, 17, 18).  October 31, 2017 was Halloween; November 11, 2017 was Veteran's Day; and November 23, 2017 was Thanksgiving.  These holidays are highlighted above.

\*     \*     \*

On December 23, 2017, at 2:44 a.m., Mr. Parker marked off from work and did not mark up again until 12:01 a.m. on December 26, 2017.  (Doc. 37-1, p. 55; Doc. 37-2, p. 35).  When Mr. Parker arrived home in the early morning of December 23, his wife was home alone.  (Doc. 37-3, p. 19, tp. 66).  She was having a POTS

---

[5] From Mr. Parker's FMLA report, it is not clear whether he marked up on October 18, 2017.  On October 19, 2017, he was out of service for a reason other than FMLA leave, and he marked up for service on October 20, 2017.  (Doc. 44-5, p. 13).  For ease of reviewing Mr. Parker's FMLA reports, "W" is CSX's status code for Mr. Parker's FMLA leave.

flare-up, and Mr. Parker "helped her get up and go to the bathroom, make it back to the couch, g[ot] her food and drink and blankets to cover her up whenever she's cold, washcloths to wipe her face." (Doc. 37-3, p. 10, tp. 67). Mr. Parker left the house on December 23 only to go to the drugstore for supplies for his wife. (Doc. 37-3, p. 19, tp. 68).

Mrs. Parker's condition did not improve on December 24, 2017. (Doc. 37-3, p. 19, tp. 69). The family did not celebrate Christmas on Christmas Eve. (Doc. 37-3, p. 20, tp. 70). Mr. Parker continued to provide care to his wife on December 24 and December 25. (Doc. 37-3, p. 20, tpp. 70–71; *see* Doc. 44-4, p. 5, tp. 10). Mrs. Parker explained that she did not recall Mr. Parker leaving the house on December 24 or 25, but "[i]f he did, it was to run to the store." (Doc. 44-4, p. 6, tp. 14). The night of December 25 at approximately 10:30 p.m., the Parkers' daughter had a seizure. (Doc. 37-21, pp. 18–25; Doc. 44-2, p. 18). Because of her POTS episode, Mrs. Parker could not drive, so Mr. Parker drove his wife and daughter to the hospital. (Doc. 37-3, p. 21, tpp. 74–76). Mr. Parker marked up for work at 12:01 a.m. on December 26, 2017; his wife's POTS episode "wasn't over, but it was getting to where she could function." (Doc. 37-3, p. 20, tpp. 73). By December 26, 2017, Mr. Parker had used his three-day window for intermittent leave, so he had to return to work. (Doc. 37-3, p. 65).

A few days later, on December 30, 2017 from 10:14 a.m. to 11:28 p.m., Mr. Parker marked off for a scheduled personal day. (Doc. 37-2, p. 35). Immediately after Mr. Parker was automatically marked up at 11:28 p.m. on December 30, Mr. Parker marked off on FMLA leave. (Doc. 37-2, p. 35). Mr. Parker was marked off for FMLA leave from 11:28 p.m. on December 30, 2017 until 7:14 a.m. on January 1, 2018. (Doc. 37-2, p. 35; Doc. 44-5, p. 19). Mr. Parker explained that he immediately marked off for FMLA leave because his "wife was having another one of the bad episodes, and I knew if I didn't mark up and mark back off FMLA I would be called out and wouldn't be able to take care of my wife." (Doc. 37-3, p. 27, tp. 101). Between the evening of December 30, 2017 and the morning of January 1, 2018, Mr. and Mrs. Parker did not leave their house. (Doc. 37-3, p. 28, tp. 102). Mr. Parker explained he spent New Year's Eve taking care of Mrs. Parker. (Doc. 37-3, p. 28, tp. 102).

* * *

There is no evidence that CSX received reports that Mr. Parker or any other CSX employee misused FMLA leave over the 2017-18 holiday season. (Doc. 44-9, p. 28, tpp. 103–04). Jolanda Johnson, CSX's FMLA benefits manager, questioned employees' use of FMLA leave over the 2017-18 Christmas and New Year holidays because she believed the number of employees "marking off" near those holidays significantly exceeded the number of employees who used FMLA leave on most

other days in 2017.  (Doc. 37-2, p. 4, ¶¶ 7–9; Doc. 37-2, p. 17).  She reports:  "Based on the sharp spike in FMLA usage over Christmas and New Year's, I believed that some employees had used leave dishonestly."  (Doc. 37-2, p. 4, ¶ 9).  CSX's charts of total FMLA mark-offs by day for 2016 and 2017 indicate that the mark-offs for Christmas 2017 were high; over 700 employees marked off as compared to 200 to 300 mark-offs on other days in 2017.  (Doc. 44-3, p. 19).  Overall, holiday mark-offs in 2017 were significantly lower than the holiday mark-offs in 2016.  (Doc. 44-3, pp. 18–19).

In consultation with CSX's Labor Relations and Law departments, Ms. Johnson decided to "charge[] with dishonesty and remove[] from service pending a hearing" employees who marked off on four of the previous ten holidays "or special occasions" in 2017.[6]  Ms. Johnson excepted from the 4-in-10 presumption of FMLA misuse an employee whose medical condition, in Ms. Johnson's opinion, "clearly explained the mark-offs."  (Doc. 37-2, p. 5, ¶ 9).  Ms. Johnson exempted employees who had cancer, who were terminally ill, or who were pregnant with due dates near Christmas or New Year's Day.  (Doc. 37-2, p. 5, ¶ 9; Doc. 44-9, p. 38, tp. 142).

---

[6]These "holidays" consisted of Christmas Day and Eve, New Year's Day and Eve, Black Friday, Thanksgiving, Veteran's Day, Halloween, Columbus Day, Labor Day, the Fourth of July, and Father's Day.  (Doc. 37-2, p. 4, ¶ 9).

Under the collective bargaining agreement between CSX and its employees represented by the United Transportation Union, dishonesty is a major offense.  (Doc. 37-1, pp. 19–20).  The United Transportation Union is now the International Association of Sheet Metal, Air, Rail and Transportation Workers.  (Doc. 37-1, p. 3, ¶ 3).

By letter dated January 8, 2018, CSX advised Mr. Parker that he was being removed from service and ordered him to "attend a formal investigation" on January 16 to "develop the facts and place your responsibility, if any, in connection with a review of your work history on December 29, 2017, in which you misused FMLA leave between December 22, 2017 and December 26, 2017, and all circumstances relating thereto." (Doc. 44-2, p. 56).[7] The collective bargaining agreement between CSX and its employees' union dictated the hearing procedure. (Doc. 44-3). The trainmen removed from service under Ms. Johnson's 4-in-10 test for FMLA misuse were entitled to a fair and impartial hearing. (Doc. 44-3, p. 27). A notice of hearing had to advise each trainman of his right to representation and to call witnesses; Mr. Parker's notice complied with this requirement. (Doc. 44-2, p. 56; Doc. 44-3, p. 28). Before the hearing, CXS could "request documents for review from the Trainman and his representative(s)," and the trainman was obligated to "promptly provide[] the responsive documents if available." (Doc. 44-3, p. 30). The hearings proceeded like this:

> A CSXT manager – known as the "hearing officer" – conducts the hearing, questioning witnesses and ruling on evidentiary objections. A Company official testifies about the basis for the charges. This manager is sometimes referred to as the "charging officer," and is usually but not always the one who decided to bring the charges. A charged employee

---

[7] Initially, a CSX crew master called Mr. Parker and told him that he was removed from service. (Doc. 44-5, p. 20; *see also* Doc. 44-1, p. 22, tpp. 78-79). Neither the crew caller nor the trainmaster on duty could tell Mr. Parker why he was being removed from service. In its January 8, 2018 letter to Mr. Parker, CSX formally advised him that he was removed from service pending an investigation of his "misused FMLA leave." (Doc. 44-2, p. 56).

is represented by a union official and can present evidence in his own defense. After the hearing, the hearing officer may issue findings, but does not issue discipline. Typically, disciplinary decisions are made by either the General Superintendent for the Region or his designee, after receiving a recommendation from Labor Relations. The CSRA sets deadlines for each stage of the disciplinary process. *See* Ex. 1 at Art. 10, § 2(A)(1)(a) (10-day time limit for charging employees); *id.* Art. 10, § 3(A)(1) (discipline must be assessed within 30 days of hearing). Failure to meet these deadlines can be grounds to overturn the discipline.

(Doc. 37-1, pp. 3–4, ¶ 4).

At Mr. Parker's hearing concerning his use of FMLA leave on December 24 and 25, 2017, Tremaylen Anderson, CSX's Human Resource Business Partner, testified about the charge against Mr. Parker. (Doc. 44-2, pp. 80, 101). Ms. Anderson stated that "the basis of the Charge is for FMLA misuse between 12/22 through 12/26/2017 was based on a high FMLA utilization over the Christmas holiday in 2017. Mr. Parker also his [*sic*] usage over the recent holiday." (Doc. 44-2, p. 83, tpp. 14–17). Ms. Anderson acknowledged that CSX did not ask Mr. Parker to provide documentation to support his FMLA leave on December 24 and 25 before the company removed him from service. (Doc. 44-2, p. 93, tp. 37). With respect to Mr. Parker's use of FMLA leave on December 24 and 25, Ms. Anderson explained:

> [W]e're not saying that there could not have been [a POTS] episode on that particular day. What we are saying is based on the facts surrounding [Mr. Parker's] FMLA usage that occurred between December 22nd and December 26th, 2017, it is clear that Mr. Parker used FMLA to avoid working the Christmas holidays.

(Doc. 37-4, p. 54).  Ms. Anderson added:

> I do not know if [Mr. Parker's] wife had an episode or not.  I do not
> know that.  Okay.  So I'm not disputing that his wife may or may not
> have had an episode.  I'm not disputing that.  But, based off of the CSX
> FMLA Policy, which clearly states that employees cannot use FMLA
> to avoid working over the Christmas holiday or over any holiday, so
> that is what we're basing this off of is our information.

(Doc. 37-4, p. 57).  When asked, "So the federal policy states that his wife can have

an episode over the holidays, but CSX states he can't, or she can't.  Is that correct?"

Ms. Anderson replied, "That's correct."  (Doc. 37-4, p. 58).

Hearing Officer J.T. Pacey questioned Mr. Parker about his FMLA use over

the Christmas holiday.  The following exchange was the entirety of Hearing Officer

Pacey's examination of Mr. Parker about his use of FMLA leave over the Christmas

holiday:

| | |
|---|---|
| Mr. Pacey: | Were you laid off FMLA during Christmas holidays? |
| Mr. Parker: | Not the whole time they have charged me for. |
| Mr. Pacey: | Alright.  So what days were you laid off? |
| Mr. Parker: | 24th and 25th. |
| Mr. Pacey: | So you were off those 2 specific days FMLA? |
| Mr. Parker: | Yes. |
| Mr. Pacey: | Mr. Brock had made mention in Miss Anderson's cross examine that your wife may have had an episode and then went to the hospital during Christmas, or Christmas Eve, Christmas Day? |

18

Mr. Parker:  I was at the hospital.

Mr. Pacey:   So you were with your wife at the hospital?

Mr. Parker:  Yes.

Mr. Pacey:   I guess that's kind of…

Mr. Parker:  Yes.

Mr. Pacey:   … question I'm asking.  But do you have documentation for that?

Mr. Parker:  Yes.

Mr. Pacey:   Do you have documentation you want to present to the Company so?

Mr. Parker:  No, I don't have it with me.

(Doc. 37-4, pp. 66–67).  Mr. Parker's union representative, R.J. Brock, asked Mr. Parker "[d]uring the time frame you were off FMLA on Christmas Day did you spend it with your wife in the emergency room in accordance with your FMLA authorization?"  (Doc. 37-4, p. 67).  Mr. Parker confirmed he did.  (Doc. 37-4, p. 67).

Mr. Pacey questioned Mr. Parker about his failure to bring medical records to the hearing.  He asked:

> So with you having a reported reason for laying off FMLA during the Christmas holidays, be it Christmas Eve, Christmas Day, and you have documentation where you spent Christmas Day in the hospital with your wife since receiving the Notice that you were coming to an investigation why wouldn't you want to present documentation saying that you were off legitimately instead of fraudulently for FMLA misuse?

(Doc. 37-4, p. 69).  Mr. Parker replied:

> Because I was called at home waiting on a train and they told me I was pulled out of service effective immediately.  Didn't give me a reason, wouldn't tell me why, they just said you're pulled out of service, Charge Letter will be sent.  Did not know what I was being charged for until I received the Charge Letter and then it's too late.

(Doc. 37-4, p. 70, tp. 54).[8]

Hearing officer Pacey concluded that CSX proved that Mr. Parker violated the FMLA leave policy.  (Doc. 44-12, p. 46).  Mr. Pacey made no credibility determinations about Mr. Parker's brief testimony.  Mr. Pacey made a single finding of fact:  "Parker admitted he was off FMLA for the Christmas Holidays."  (Doc. 44-12, p. 46).

After the January 16, 2018 hearing, Mr. Parker gathered medical records relating to Mrs. Parker's health in December of 2017 and January of 2018.  He brought them with him to the February 1, 2018 hearing that CSX convened to determine if Mr. Parker's use of FMLA leave between December 30, 2017 and January 2, 2018 warranted discipline.  (Doc. 44-3, pp. 48, 97).  Trainmaster Russell Weeks, acting as the Conducting Officer, presided over an investigatory hearing.  (*see* Doc. 44-3, pp. 48–51).

---

[8] CSX placed the January 8, 2018 letter in the mail to Mr. Parker on January 8, 2018 and sent it priority mail two-day service.  (Doc. 37-4, pp. 14–15).

Ms. Johnson served as the charging officer and explained why CSX charged Mr. Parker with FMLA misuse:

> The basis for the charge of FMLA misuse between on [*sic*] 12/30/2017 and 1/2/2018 is based on a few factors. One being the high FMLA utilization that [CSX] experienced over the New Year's holiday in 2017-2018. Also, an individualized review was completed. And then lastly, Mr. Parker did receive a counseling letter in 2017 regarding how he was using his FMLA.

(Doc. 44-3, p. 59).

Ms. Johnson reported that her individualized review of Mr. Parker's FMLA use between June 15, 2017 and 2018 "clearly shows where Mr. Parker has consistently been off in FMLA status on holidays as well as other events." (Doc. 44-3, p. 60, tp. 11). Ms. Johnson asserted that "Mr. Parker was notified on at least 6 separate occasions about what is considered FMLA misuse," and that, "[b]ased on the facts and circumstances surrounding the FMLA usage that occurred on December 31st, 2017, it's clear that Mr. Parker misused FMLA leave, by using FMLA leave to avoid working over the New Year holiday in 2017." (Doc. 44-3, p. 62). Ms. Johnson stated that the "high FMLA utilization over the New Year's holidays" by CSX employees "certainly negatively impacted the company, which contributes to crew unavailability and train delays." (Doc. 44-3, p. 60). Ms. Johnson explained that there were approximately 74 train delays over the holiday, crew members who otherwise would have had the holiday off were forced to work, and "customers were negatively impacted." (Doc. 44-3, p. 60).

According to Ms. Johnson, "Mr. Parker using FMLA to avoid working over the New Year holidays, specifically December 31st, 2017, is considered dishonest and a violation of Operating Rule 104.2(a)." (Doc. 44-3, p. 68). Ms. Johnson did not ask Mr. Parker why he marked off between December 31, 2017 and January 2, 2018, and she did not know before charging him whether his wife had a POTS episode over the holiday. (Doc. 44-3, pp. 69, 78).

Ms. Johnson stated that "the Company cannot require" an employee to provide "any documentation" of a particular use of FMLA intermittent leave after CSX authorizes a 12-month period of leave, but "employees have the option, if they want to submit all documentation" to CSX, and if the documentation an employee volunteered "support[ed] or justif[ied] the employee [FMLA] usage during the charge period, definitely then we would take that into consideration, take the appropriate next step." (Doc. 44-3, p. 74; *see also* Doc. 44-3, p. 73 (Ms. Johnson's internal investigation testimony that "employees are not required to provide documentation outside of what is stated on the FMLA form" request for intermittent FMLA leave)). When Mr. Brock, Mr. Parker's union representative, asked Ms. Johnson what documentation Mr. Parker could submit "to make it a valid FMLA layoff during a holiday or weekend," Ms. Johnson replied, "I cannot state what needs to be provided," (Doc. 44-3, p. 73), but Ms. Johnson noted that "Mr. Parker did not provide any medical documentation to justify the leave," (Doc. 44-3, p. 74). Because

CSX was not allowed to require Mr. Parker to provide documentation to substantiate his FMLA leave, to charge Mr. Parker with dishonest use of FMLA leave, Ms. Johnson simply looked "at how Mr. Parker was off over the recent holiday and as it clearly shows Mr. Parker has consistently been off FMLA over holidays and other events." (Doc. 44-3, p. 70).

During the hearing, Mr. Parker provided to Ms. Johnson a January 31, 2018 letter from Dr. Jordan F. Vaughn at MedHelp and records from Mrs. Parker's December 2017 and January 2018 appointments with Dr. Moore. The letter from Dr. Vaughn states that Mrs. Parker:

> had a series of incapacitating episodes throughout the month of December 2017 and January 2018. These episodes have required monitoring, physician care and hospitalization. It has been my recommendation that her husband, Allen Parker, stay with her during these episodes. While having an episode, [Mrs. Parker] is unable to safely do everyday tasks (i.e. drive, maneuver stairs, walk to and from her bed to the bathroom, etc.) without his help. She has had recurring blackouts and constant vertigo.

(Doc. 37-5, p. 41; Doc. 37-14, p. 31 (same)).[9]

---

[9] Mrs. Parker worked for MedHelp as its controller and HR manager. (Doc. 44-4, p. 4, tp. 7). Dr. Vaughn treated Mrs. Parker for dizziness, vertigo, and fainting. (Doc. 44-6, p. 7, tp. 18). Mrs. Parker explained that every time she got dehydrated at work, she would "go downstairs and get an IV bag." (Doc. 44-4, p. 5, tp. 11). Dr. Vaughn confirmed that when Mrs. Parker was having an episode, she would have to get IV hydration and might need to go home. If she had to leave work, she was not allowed to drive. Someone would have to pick her up from work. (Doc. 44-6, pp. 6, 8, tpp. 17, 23–24).

Dr. Moore's medical record from December 7, 2017 explains that Mrs. Parker was experiencing "[n]ear syncope, dizziness, migraines, palpitations, racing heart, [and] chest pain." (Doc. 37-14, p. 35).[10] Dr. Moore reported that on December 6, 2017, Mrs. Parker had had "a pretty 'close call'" while driving. "She suddenly felt her heart starting to race . . . . Shortly after, everything went black, which resulted in her hitting the concrete barrier on the side of the highway." (Doc. 37-14, p. 35). "When she came to completely, she was having some chest pain, tachycardia, and [shortness of breath]." (Doc. 37-14, p. 35). Mr. Parker went to meet Mrs. Parker. (Doc. 37-14, p. 35). Dr. Moore noted that Mrs. Parker was experiencing intermittent tachycardia and chest pain and weekly to biweekly heart palpitations. (Doc. 37-14, p. 35). Because of Mrs. Parker's crash and her symptoms, Dr. Moore "asked her not to drive for the next week. Stay off interstate til end of year." (Doc. 37-14, p. 37).[11] Dr. Moore instructed Mrs. Parker to return in three to four weeks. (Doc. 37-14, pp. 37–38).[12]

---

[10] "Syncope . . . is the medical term for fainting or passing out. It is caused by a temporary drop in the amount of blood that flows to the brain." CLEVELAND CLINIC, *Syncope*, https://my.clevelandclinic.org/health/diseases/17536-syncope (last visited July 12, 2021).

[11] Mr. Parker used FMLA leave on December 6, 2017, the day that Mrs. Parker blacked out while driving. (Doc. 44-5, p. 17).

[12] In her December 7, 2017 medical record for Mrs. Parker, Dr. Moore directed: "I think that [Mrs. Parker] is very dehydrated based on her symptoms over the last week really. I have asked her to see if she can get a liter of IVF when she returns to work today." (Doc. 37-14, p. 37).

The January 4, 2018 medical records from Dr. Moore state, in part, that Mrs. Parker reported "room-spinning" dizziness that began on January 3, 2018. Mrs. Parker was vomiting. Dr. Moore commented that the symptoms were "normal for" Mrs. Parker. (Doc. 37-14, p. 32). Dr. Moore's January 4, 2018 record states that Mrs. Parker had been suffering from heart palpitations and tachycardia for several weeks. (Doc. 37-14, p. 32). Dr. Moore sent Mrs. Parker to the emergency room for treatment for acute vertigo, heart palpitations, tachycardia, and nausea. (Doc. 37-14, p. 33). Dr. Moore stated that Mrs. Parker could not drive until her symptoms were resolved. (Doc. 37-14, p. 33).[13]

After the February 1, 2018 hearing, to assist CSX in its evaluation of Mr. Parker's FMLA usage over the 2017-18 holiday season, Dr. Craig Heligman, CSX's Chief Medical Officer, reviewed the letter from Dr. Vaughn and the medical records from Dr. Moore dated December 7, 2017 and January 4, 2018. Dr. Heligman was not satisfied with the medical records that Mr. Parker provided, so he asked for the contact information for Dr. Moore and tried to call her. (Doc. 37-14, pp. 13–14, tpp. 44–46; Doc. 37-14, p. 26 (email from Dr. Heligman requesting information about Parker certifying physician)). Dr. Heligman did not speak to Dr. Moore. (Doc. 37-14, pp. 14–15, tpp. 49–50). Dr. Heligman stated that he could not reach an opinion

---

[13] At the hearing regarding his use of FMLA leave over the New Year's holiday, Mr. Parker explained: "once my wife is out, the children don't have anyone. So I have to take care of everyone, not just her." (Doc. 44-3, p. 84, tp. 35).

about the validity of Mr. Parker's FMLA usage without speaking to Mrs. Parker's certifying physician. Dr. Heligman did not try to call Dr. Moore again after his first attempt. (Doc. 37-14, p. 14–15, tpp. 49–50).

Macon Jones, a CSX Labor Relations Senior Manager, was responsible for making disciplinary recommendations to General Superintendent John Layne in cases involving employees in CSX's Southwest Region, the region in which Mr. Parker worked. (Doc. 44-18, p. 7, tpp. 18, 20). Mr. Jones did not submit his recommendation concerning Mr. Parker's discipline until 12:08 a.m. on Thursday, February 15, 2018, two weeks after Mr. Parker submitted Mrs. Parker's medical records to CSX. (Doc. 37-12, p. 10). Erica McNair, a CSX staff member, wrote in an email at 6:55 a.m. on February 15, 2018: "Discipline is due out TODAY." (Doc. 37-12, p. 12). The same day, at 10:53 a.m., Melissa Wheaton, a lawyer who served as CSX's Director of Labor relations, asked Mr. Jones:

> Please specify between warning and final warning letter in the emails. If only a warning and a relatively clean IDPAP record (no other majors within 3 years etc., then 30 days. Final warning, we can recommend dismissal.

(Doc. 37-12, p. 10).

At some point later that day, Mr. Jones emailed Ms. McNair with a recommendation for dismissal. (Doc. 37-12, p. 14). The email prompted Ms. McNair to issue a dismissal letter to Mr. Parker. (Doc. 37-12, p. 13). Ms. Wheaton wrote at 4:26 p.m. that she "spoke with Latasha [Garrison-Fullwood, a CSX "Senior Counsel"], please assess 30 days/time served. We will revisit for additional discussions." (Doc. 37-12, p. 15). Ms. McNair wrote at 4:29 p.m. that "I will [*sic*] an amendment for time served which will go out in the morning," (Doc. 37-12, p. 15), and in another email sent at 4:34 p.m., Ms. McNair wrote: "We will amend original discipline letter which was mailed within the time limits," (Doc. 37-12, p. 13). CSX did not amend Mr. Parker's discipline to time served.

By letter dated February 15, 2018, CSX notified Mr. Parker that he was fired because he had violated CSX Transportation Operating Rule 104.2 by being dishonest about his FMLA leave between December 22, 2017 and December 26, 2017. (Doc. 45-8, p. 2). By letter dated March 2, 2018, two weeks after it fired him the first time, CSX fired Mr. Parker again for dishonesty, this time for his FMLA use between December 31, 2017 and January 2, 2018. (Doc. 37-21, p. 69).

Mr. Parker appealed his termination under CSX's collective bargaining agreement. In a June 4, 2018 letter to Dale Barnett, General Chairman of the International Association of Sheet Metal, Air, Rail and Transportation Workers

Union, Mr. Jones defended CSX's decision with respect to Christmas 2017 and explained that "[t]he high FMLA utilization on Christmas prompted a review of [Mr. Parker's] FMLA usage. Moreover, [Mr. Parker] never submitted any medication documentation to support his mark offs." (Doc. 45-1, p. 3). Mr. Jones stated that Mr. Parker "testified and agreed he marked off the days outlined by [CSX], but explained his mark offs were legitimate. When asked about medication documentation, [Mr. Parker] stated he had documentation, but did not bring it to the investigation." (Doc. 45-1, p. 3). Mr. Jones continued:

> The facts in this incident are not in dispute. Claimant was approved for FMLA usage during the time Claimant marked off, but his actions created a pattern of misuse in an effort to avoid work. To be clear, Claimant is not charged with marking off on prior holidays in 2017. Rather, those mark offs are present to show a pattern of Claimant's usage on and around holidays. Here, consistent with that pattern, Claimant marked off on Christmas Eve and Christmas Day 2017. Those actions, coupled with the insanely high FMLA utilization on Christmas Eve and Christmas Day 2017, show this is not a simple coincidence, but an effort by Claimant to mark off to avoid work. Incredibly, Claimant refused medical documentation to support his actions and simply explained he did not bring it to the investigation. Apparently, Claimant wishes to mark off at his whim and the Carrier is left to accept his word at face value he is properly using FMLA. Claimant was given the opportunity to legitimize his actions and provide support for his markoffs, but refused. Considering Claimant's pattern of behavior and his refusal to submit documentation, there is sufficient circumstantial evidence to show Claimant violated the charged rule.

(Doc. 45-1, p. 4).[14]

An arbitration board consisting of Mr. Jones, a CSX employee representative, and a neutral upheld CSX's first termination decision. (Doc. 37-1, p. 55). The arbitration board found "that the record contains substantial evidence in support of the charge and [Mr. Parker's] violation of CSX[] Operating Rule 104.2, prohibiting dishonesty." (Doc. 37-1, p. 54). In its written decision, the board focused on CSX's several warnings to employees that use of FMLA leave to avoid work on a holiday was fraudulent, CSX's contention "that [Mr. Parker's] history of taking FMLA leave on holidays warranted an individualized review of his FMLA leave use," and Mr. Parker's failure to submit "medical documentation he claimed to have possessed." (Doc. 37-1, p. 55).

The identical arbitration board consisting of Mr. Jones, a CSX employee representative, and a neutral upheld CSX's second termination decision. (Doc. 37-1, pp. 57–58). In its written decision, the board again focused on CSX's several warnings to employees that use of FMLA leave to avoid work on a holiday was fraudulent and CSX's contention "that [Mr. Parker's] history of taking FMLA leave

---

[14] Mr. Jones later testified that "the thing that weighed on me probably the most in this was the fact that [Mr. Parker] provided a very, very specific explanation for his time, but he didn't provide any corroborating information related to that. And it's the type of thing -- the emergency room visit is the type of information that would be easily assessed if it were true." (Doc. 37-10, p. 43, tpp. 164–65).

on holidays again warranted an individualized review of his FMLA leave use."
(Doc. 37-1, p. 55). The board stated: "the facts in the present case are nearly
identical, and [] this record likewise lacks any documentary evidence in support of
claimant's position that his FMLA layoff was defensible under FMLA policy and
the conditions of his FMLA leave." (Doc. 37-1, p. 58). Consequently, the board
concluded that substantial evidence supported the decision to terminate Mr. Parker.
(Doc. 37-1, p. 58).

## III.

## FMLA RETALIATION

The FMLA "prohibits an employer from . . . retaliating against an employee .
. . for having exercised . . . FMLA rights," and an employer can neither "use the
taking of FMLA leave as a negative factor in employment actions" nor
"discourage[e] an employee from taking such leave." 29 C.F.R. § 825.220(b) & (c).
Mr. Parker relies on circumstantial evidence to prove that CSX retaliated against
him because he used FMLA leave. (Doc. 46, pp. 36–55).

When relying on circumstantial evidence in an FMLA retaliation case, a
plaintiff may establish a prima facie case by using the *McDonnell Douglas* burden
shifting test. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271
(11th Cir. 2017); *Shannon v. Nat'l R.R. Passenger Corp.*, 774 Fed. Appx. 529, 544

(11th Cir. 2019) ("Absent direct evidence of a defendant's retaliatory intent, a plaintiff's FMLA retaliation claim is evaluated under the *McDonnell Douglas* framework."); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff may establish a prima facie case by demonstrating that: "(1) [he] engaged in statutorily protected activity, (2) [he] suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Jones*, 854 F.3d at 1271 (internal quotation marks and citations omitted). A plaintiff may establish causation by showing that his employer "'was aware of the protected conduct at the time of the adverse employment action.'" *Jones*, 854 F.3d at 1271 (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010)).

If a plaintiff successfully establishes a prima facie case, then the burden shifts to the employer to articulate "a legitimate, nondiscriminatory reason" for the adverse employment action, "which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations and quotation marks omitted) (emphasis in *Hicks*). If the employer articulates a legitimate, nondiscriminatory reason, then the burden returns to the plaintiff to prove that the employer's stated reason for the adverse employment action is pretext for the retaliatory conduct. *Hicks*, 509 U.S. at 507. A plaintiff may demonstrate that his employer's articulated reasons for an adverse employment action were pretextual

"by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348–49 (11th Cir. 2007) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied*, 546 U.S. 960 (2005)).

As always, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328 (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011)). "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith*, 644 F.3d at 1328 (quoting *Silverman*, 637 F.3d at 734). The same is true for retaliatory intent with respect to an employee's exercise of his rights under the FMLA. *Benz v. Crowley Maritime Corp.*, 732 Fed. Appx. 794, 804 (11th Cir. 2018).

For purposes of summary judgment, CSX has assumed that Mr. Parker can establish a prima facie case of retaliation. (Doc. 39, p. 23; Doc. 48, p. 5).[15] CSX argues that it "did not dismiss Parker *solely* because he used FMLA leave." (Doc. 39, p. 24) (emphasis added). CSX reports that it "dismissed Parker for using FMLA leave dishonestly" and contends that "[t]his is a legitimate, non-discriminatory basis for discipline." (Doc. 39, p. 24). An employee's dishonest use of FMLA leave is a legitimate reason for an adverse employment action. *Parker v. Verizon Pa., Inc.*, 309 Fed. Appx. 551, 563 (3d Cir. 2009) ("Just as suspected fraud or violation of company policy would be a sufficient basis to discharge an employee not on FMLA leave, it is a sufficient basis to discharge one who misuses FMLA leave."); *see generally E.E.O.C. v. Total System Servs., Inc.*, 221 F.3d 1171 (11th Cir. 2000).

The Court has not located an Eleventh Circuit FMLA retaliation decision concerning an employee's alleged dishonest use of FMLA leave. In *Total System,* the Eleventh Circuit discussed employee dishonesty as a basis for an adverse employment action in a Title VII retaliation case. In that case, the defendant employer began an internal investigation regarding complaints that a supervisor had been sexually harassing employees. Members of the company's human resources department interviewed eight female employees and three male employees. One of

---

[15] CSX still questions whether Mr. Parker legitimately used FMLA leave on December 24, 25, and 31, 2017. The medical evidence in the record indicates that Mrs. Parker was struggling with dysautonomia and POTS throughout December 2017 and January 2018.

the men reported a rumor that the alleged harasser had approached several female employees, unzipped his pants, and made lewd remarks. The interviewers asked the female interviewees about the rumor. One woman, Lindy Warren, indicated that "she observed the zipper incident." *Total System*, 221 F.3d at 1173. Ms. Warren reported that two female co-workers were present during the zipper incident, but the co-workers denied seeing the incident. *Total System*, 221 F.3d at 1173.

HR vice president Elizabeth James questioned Ms. Warren about the zipper incident and "became convinced that Warren had not told the truth about the incident." *Total System*, 221 F.3d at 1173. Ms. James fired Ms. Warren for lying during an investigation. Ms. Warren challenged Ms. James's decision, and the Vice Chairman of the Board of Total Systems "ordered a reinvestigation into the incident to determine whether [Ms. Warren] had fabricated that story or the statement was merely uncorroborated. [Ms.] James conducted the reinvestigation." *Total System*, 221 F.3d at 1173. Ms. James interviewed the two female co-workers who Ms. Warren identified as witnesses to the zipper incident.

> Norwood and Silvestri again denied witnessing the incident. Norwood declared that it would have been impossible for her to miss the incident Warren described. Moreover, Norwood said that Warren had come to Norwood's house and tried to convince her that the incident had indeed taken place.

*Total System*, 221 F.3d at 1173. "Following the reinvestigation, Warren's termination was allowed to stand." *Total System*, 221 F.3d at 1173.

On behalf of Ms. Warren, the EEOC sued Total System for retaliation. The district court granted Total System's motion for summary judgment, and the Eleventh Circuit affirmed. The Eleventh Circuit explained that an employer faced with a charge of retaliation based on its finding that an employee was dishonest cannot be "forced to prove – presumably in a court of law – more than its good faith belief that a false statement was knowingly made," and a defendant "offer[s] a legitimate nondiscriminatory reason" for an employee's termination when the employer asserts that it made a good faith determination that the employee behaved dishonestly. *Total System*, 221 F.3d at 1176; *see also id.* at 1176 ("[A]n employer, in these situations, is entitled to rely on its good faith belief about falsity, concealment, and so forth.").

The Eleventh Circuit opined: "whether to fire an employee for lying to the employer in the course of the business's conduct of an important internal investigation is basically a business decision; this decision, as with most business decisions, is not for the courts to second-guess as a kind of super-personnel department." *Total System*, 221 F.3d at 1176 (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). The Court of Appeals continued:

When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice. And, at least when the circumstances give the employer good reason to believe that the fictitious version was the result of a knowingly false statement by one of its employees, the law will not protect the employee's job.

*Total System*, 221 F.3d at 1176.

Having found that Total System articulated a legitimate nondiscriminatory reason for Ms. Warren's termination, the Eleventh Circuit affirmed the judgment in favor of Total System because the EEOC "present[ed] no evidence that Defendant lacked a good faith belief that Warren lied. The record compels a finding of good faith." *Total System*, 221 F.3d at 1177.

Consistent with *Total System*, the Court finds that CSX has articulated a legitimate, nondiscriminatory reason for firing Mr. Parker by asserting that it dismissed him based on its good faith belief that he "us[ed] FMLA leave dishonestly." CSX has carried its very light burden. *See Woods v. Delta Air Lines Inc.*, 595 Fed. Appx. 874, 878 (11th Cir. 2014) (explaining that an employer has an "'exceedingly light' burden to proffer, but not prove, a legitimate, nonretaliatory reason for its employment action.") (citing *Vessels v. Atl. Indep. Sch. Sys.*, 408 F.3d 763, 769–70 (11th Cir. 2005)).

Therefore, the burden returns to Mr. Parker to "present[] evidence that Defendant lacked a good faith belief that [he] lied" about his need for FMLA leave over the 2017-18 holiday season. *Total System*, 221 F.3d at 1177; *Godwin v. Corizon Health*, 732 Fed. Appx. 805, 807 (11th Cir. 2018) (noting that in an FMLA retaliation case concerning employee's use of intermittent FMLA leave, the "inquiry into pretext centers on the employer's beliefs"); *Tillman v. Ohio Bell Telephone Co.*, 545 Fed. Appx. 340, 349 (6th Cir. 2013) (stating that at the pretext stage, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.") (internal quotation marks and citation omitted).

Mr. Parker cannot avoid summary judgment on his retaliation claim simply by demonstrating that he was not dishonest in his use of FMLA leave during the 2017-18 holiday season. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether employer believed the employee had done wrong.") (citing *Hawkins v. Ceco Corp.*, 883 F.2d 977 (11th Cir. 1989)). Rather, Mr. Parker must offer evidence from which jurors may conclude that the circumstances surrounding CSX's investigation of his use of FMLA leave over the 2017-18 holiday season reveal that the investigation was not conducted in good faith, such that CSX could not legitimately conclude that Mr. Parker misused FMLA leave

on December 24, 25, and 31. *Total System,* 221 F.3d at 1176 (referring to the circumstances surrounding an employer's investigation and the employer's obligation to make an "honest choice" between conflicting versions of events); *Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001) (in evaluating an employer's articulated good faith assessment of risk concerning a proposed reasonable accommodation in an ADA case, "[t]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.") (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).[16]

Mr. Parker has presented evidence that contradicts each of the three pillars on which CSX's articulated good faith reason for terminating him rests.[17]

---

[16] In *Lowe*, the Eleventh Circuit cited the Supreme Court's decision in *Bragdon v. Abbott* for the proposition that a good-faith belief "is insufficient if it is not grounded in" objective evidence. *Lowe*, 244 F.3d at 1308 (citing 524 U.S. 624, 649 (1998)). In *Lowe*, the Eleventh Circuit reversed a judgment in favor of the employer because the record contained disputed evidence concerning the reasonableness of the employer's assessment of the employee's ability to perform the essential functions of his prior position. *Lowe*, 244 F.3d at 1309.

[17] Therefore, the pretext analysis in this case differs from the pretext analysis in *Total System*, and the Court is not compelled to make a finding of good faith. *Total System*, 221 F.3d at 1177.

## Reason 1 – Statistical Evidence

CSX argues that statistical evidence establishes that it believed in good faith that Mr. Parker was dishonest in his use of FMLA leave. CSX states:

> Parker was one of hundreds of T&E employees who marked off for FMLA leave over Christmas 2017 and New Year's 2018. (Doc. 37-2 ¶¶ 7-8.) The number of employees who marked off over these holidays far exceeded the norm. (*Id.* ¶ 7 (approximately 750 employees marked off Christmas morning compared with 200-300 most other days).) What's more, as soon as the holidays were over, the number of mark-offs returned to normal. (*Id.* ¶ 8 & p. 17.) Had these employees called out sick rather than taking FMLA leave, they would have accrued points under the attendance policy and may have been disciplined. (Doc. 39-1.) Under these circumstances, CSXT reasonably believed some of its employees had used FMLA leave dishonestly, and investigated the mark-offs.

(Doc. 39, p. 26).

CSX's opening argument illustrates why the Eleventh Circuit repeatedly has cautioned that statistics are meaningless without context. *Brown v. American Honda Motor Co.,* 939 F.2d 946, 952 (11th Cir. 1991) (statistics without a proper analytic foundation are "virtually meaningless"); *Kilpatrick v. Tyson Food, Inc.*, 268 Fed. Appx. 860, 863 (11th Cir. 2008) (same).[18] CSX's holiday misuse presumption is

---

[18] *See also* Craig R. Callen, *Adjudication and the Appearance of Statistical Evidence*, 65 TUL. L. REV. 457, 467–68 (1991) ("In order to evaluate the worth of a statistic, one must view the statistic in the context of empirical events. Illustrative of this proposition is a familiar statistic, the batting average. Hitters in baseball are often judged in terms of their batting average. Yet, that statistic does not reflect the number of times each hitter has had an opportunity at bat, received bases on balls, or had extra base hits. The park or league in which the hitter played may particularly favor hitters or pitchers; the hitter may not have faced, or may have been unsuccessful against, particular

arbitrary.  It takes little imagination to identify legitimate explanations for increases in the number of employees using intermittent FMLA leave over holidays.  The most obvious is that paid caregivers may not be available over holidays, causing CSX employees to have to stay home to care for qualified family members.

To narrow the field of possible offenders, CSX adopted Ms. Johnson's *ad hoc* 4-in-10 test for identifying the employees who CSX would investigate further for their presumed FMLA misuse.  The test is problematic.  For starters, it targets employees who may have the greatest need for FMLA leave by investigating only employees who used FMLA leave on at least four of the preceding ten holidays.  Only by examining an employee's overall FMLA usage could CSX determine if there was anything suspicious about the use of FMLA leave over several holidays.  For example, if an employee used FMLA leave for ten days in a 12-month period, and five of those days were holidays, an employer might have reason to suspect misuse of leave.  If an employee used FMLA leave for 60 days in a 12-month period and five of those days were holidays, there would be much less reason to pursue an investigation.  CSX focused on employees' use of FMLA leave on holidays without considering context.

---

pitches or pitchers.  Without more information, and information better adapted to the task at hand, scouts or fans cannot make good judgements about hitters based on their batting averages.").

And the 4-in-10 test that CSX used is both under- and overinclusive. A CSX employee could lie about the need for FMLA leave on December 25, 2017 and December 31, 2017 and face no investigation if she had not used FMLA leave on other holidays and special occasions.[19] Another employee could legitimately use FMLA leave for every holiday and special occasion between January 1, 2017 and December 31, 2017 and be removed from service based on the 4-in-10 presumption that the employee was dishonest, punishing that employee for a substantial need for leave.

Had CSX examined Mr. Parker's overall FMLA usage before the company charged him for FMLA misuse and removed him from service, it would have discovered that he had used a significant amount of intermittent leave between October 31, 2017 and December 31, 2017. According to CSX's FMLA records, Mr. Parker used FMLA leave for part or all of 20 non-holiday days between October 31, 2017 and December 31, 2017. (Doc. 37-12, p. 6). Mr. Parker's FMLA use was not isolated to holidays. Had CSX examined its FMLA authorization for Mr. Parker for the 12-month period that included the two-month period from October 31 to

---

[19] CSX points out that in 2017, "[a]t least 600 [CSX] employees who used Christmas leave on Christmas Day were never even charged." (Doc. 48, p. 4). That is because those employees did not qualify for Ms. Johnson's random 4-in-10 test. Logically, given the number of warnings that CSX issued about FMLA misuse over holidays, an employee would feel much safer fudging an FMLA day over Christmas or New Year's if he had not used FMLA leave on previous holidays. Because of the warnings, an employee like Mr. Parker would know that his conduct was under a magnifying glass if he frequently used FMLA leave over holidays.

December 31, 2017, CSX would have found that Mr. Parker's actual FMLA usage was entirely consistent with the intermittent leave that CSX authorized. *See Roberts v. Rayonier, Inc.*, 135 Fed. Appx. 351, 360 (11th Cir. 2005) ("[A] reasonable juror could infer that Rayonier was not motivated by an honest belief that such disclosures took place based upon the lack of evidence of significant investigation.").

CSX asserts that "[a]t least 600 employees who used FMLA leave on Christmas Day were never even charged," and of the 123 employees who CSX charged with FMLA misuse, 42 were not disciplined. (Doc. 48, p. 4). But that means that at least 35% of the employees who CSX charged and removed from service pending investigation based on Ms. Johnson's arbitrary 4-in-10 test did not misuse FMLA leave. And that's not counting the employees who CSX wrongfully disciplined. The reverberating message CSX sent to employees with its arbitrary test is clear: use FMLA leave over the holidays, and you may be taken out of service to face charges of misuse. The chilling effect of CSX's mass charging of employees with FMLA misuse based on an arbitrary 4-in-10 test is unmistakable.

Importantly, CSX had no corroborating evidence of FMLA misuse for the 123 employees Ms. Johnson removed from service based on the 4-in-10 test. (Doc. 37-2, p. 5, ¶¶ 10, 11; Doc. 44-9, p. 29, tp. 109). No one had reported to CSX that they saw a CSX employee who took FMLA leave on Christmas Eve or Christmas Day engaging in conduct that was inconsistent with FMLA leave. (Doc. 44-9, p. 28, tpp.

103–04). Ms. Johnson had CSX managers probe social media and found no evidence that either Mr. Parker or his colleagues who used FMLA leave between December 22, 2017 and January 2, 2018 were not ill themselves or caring for qualified family members. (Doc. 44-9, p. 28, tp. 104).[20] CSX did not surveil employees like Mr. Parker who had used intermittent FMLA leave over several holidays to determine whether the employees were, for example, fishing or playing golf when they "marked off" to care for qualified family members. (Doc. 44-9, p. 28, tp. 104). Despite the dearth of evidence of FMLA misuse, Ms. Johnson scheduled the 123 employees who she presumed to be dishonest for disciplinary hearings. Mr. Parker was one of those employees.

## Reason 2 – Mr. Parker Used FMLA Leave on Holidays

Besides relying on the statistic that more of its employees used FMLA leave over the December holidays than at other times of the year, CSX points to the "inherently suspicious timing" of Mr. Parker's Christmas and New Year's mark-offs and the fact that Mr. Parker used FMLA leave on Halloween and Thanksgiving in 2017. (Doc. 39, p. 26; *see also* Doc. 48, p. 3). The only thing that is "inherently suspicious" about the timing of Mr. Parker's FMLA leave on December 24, 25, and

---

[20] CSX points out that Ms. Johnson testified that "a lot of the investigations that were conducted through the social media, the employees had privacy on it. So that's not to say because there were no findings, that the employee did not use FMLA inappropriately." (Doc. 37-8, p. 40, tp. 152); *see* Doc. 48, p. 8. Ms. Johnson's testimony goes to the weight of Mr. Parker's evidence concerning CSX's investigation. Moreover, the Court has found no evidence that Mr. Parker used privacy settings that prevented CSX from viewing social media relating to him or his wife.

31 is the fact that those days of leave coincide with holidays. Mr. Parker marked off at 2:44 a.m. on December 23 and marked up at 12:01 a.m. on December 26. He marked off at 11:28 p.m. on December 30 and marked up at 7:14 a.m. on January 1. (Doc. 37-2, p. 8, ¶ 19). The specific timing of these mark-offs may be "inherently suspicious" to CSX, but the company has not explained why the timing should be suspicious to a factfinder. For example, Mr. Parker explained that when he arrived home in the early morning hours of December 23, he discovered that his wife was having a POTS flareup, and he began taking care of her. (Doc. 37-3, p. 10, tp. 67). CSX has offered no evidence to prove that Mr. Parker was lying, and the Court accepts his version of events at the summary judgment stage of this case.

If the only thing suspicious about the timing of Mr. Parker's leave over Christmas and New Year's is the fact that Mr. Parker took leave over Christmas and New Year's, then the timing argument is merely a repeat of CSX's statistical argument, fine-tuned to the exact minutes that Mr. Parker marked off and on for his periods of intermittent leave. The amount of leave he took – three days between December 23 and December 26 and two days between December 30 and January 1 – is consistent with the periods of intermittent leave that CSX authorized for Mr. Parker. (Doc. 37-3, p. 65) (approving FMLA leave for "1-3 episodes per week, up to 3 days per episode"). CSX admitted as much in its investigation. (Doc. 44-3, pp. 76–77).

Mr. Parker's use of FMLA leave over Halloween and Thanksgiving of 2017 is no more remarkable without some corroborating evidence of misuse. For example, Mr. Parker took leave at 9:47 p.m. on October 30, 2017. There is nothing remarkable about that. He marked up again for work at 7:50 a.m. on November 1, 2017. (Doc. 37-2, p. 35). Nothing remarkable there, either. Jurors could reasonably infer that he marked back up after he took his children to school, a task that would be his if his wife was struggling with dizziness and vertigo and unable to drive. (Doc. 44-3, p. 84, tp. 35) (Mr. Parker's testimony that when Mrs. Parker could not drive because of POTS, he had to care for their children); (Doc. 37-3, pp. 63–64) (medical certification for Parker intermittent FMLA leave stating that Mrs. Parker would need assistance with driving during episodes).

And there is nothing suspicious, inherently or otherwise, about Mr. Parker's use of FMLA leave on the holidays that fell on October 31, November 11, November 23, December 24, December 25, and December 31 when those dates are placed in the context of Mr. Parker's full FMLA use between October 31 and December 31, 2017. CSX's records demonstrate that Mr. Parker used FMLA leave from October 30 to November 1 and then again from November 3 until November 6. Both uses are authorized uses of up to three days of leave. Likewise, he used FMLA leave not only on November 11, Veteran's Day, but also for more than 14 hours on November 12. He used another 31 hours of FMLA leave between November 18 and 19 and

then nine days of FMLA leave between Thanksgiving Day and Christmas Eve. The evidence viewed in the light most favorable to Mr. Parker – evidence that was available to CSX and within its control before and after it decided to remove Mr. Parker from service – indicates that Mrs. Parker was struggling significantly with POTS and dysautonomia in the two-month period between October 31, 2017 and December 31, 2017. CSX did not consider this information in evaluating Mr. Parker's use of authorized FMLA leave.

Jurors could find that CSX intentionally avoided evidence in its own records that might contradict its theory of FMLA misuse. As Ms. Anderson testified in Mr. Parker's first hearing, it really didn't matter whether Mrs. Parker experienced an episode over the holidays; Mr. Parker misused FMLA leave because he took leave over the holidays – end of analysis. (Doc. 37-4, pp. 54, 57). *See Villanueva v. Walgreen Co.*, No. CIV 10-1121 BB/WPL, 2012 WL 13081652, at *7 (D.N.M. Mar. 29, 2012) (stating that in a retaliation case relating to an investigation, "[t]he correct analysis requires the Court to examine Defendant's conduct in investigating the incidents as well as the information provided to Defendant. The Court must then determine whether issues of fact exist concerning the good-faith nature of the investigation or as to other circumstances that could indicate Defendant blinded itself to significant facts contradicting its decision"; concluding that employer's

investigation was sufficient) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000)).

## Reason 3 – Lack of Medical Records

Finally, CSX points to Mr. Parker's failure to produce medical records to prove that his wife was experiencing POTS episodes over the Christmas and New Year holiday. (Doc. 39, pp. 26-27). CSX states:

> Parker's failure to produce hospital records severely undermined his credibility in CSXT's eyes. (Doc. 37-10, p. 43: tp. 164:18-165:3 (failure to produce hospital records was "the thing that weighed on [Mr. Jones] the most").) Jones reasoned that, if Parker had truly been in the hospital with his wife, he should have some records to prove it. (*Id.*)

(Doc. 39, p. 27). This argument is problematic for several reasons.

For starters, during CSX's hearing regarding Mr. Parker's use of FMLA leave on December 31, 2017, Ms. Johnson stated that CSX could not require an employee to provide documentation of his use of intermittent FMLA leave after CSX authorized a 12-month period of leave. CSX could offer an employee "the option, if they want to submit all documentation." (Doc. 44-3, p. 74, tp. 25; *see also* Doc. 44-3, p. 73, tp. 24 (Ms. Johnson's internal investigation testimony that "employees are not required to provide documentation outside of what is stated on the FMLA form" request for intermittent FMLA leave)). So, CSX knew when it conducted its

investigation that it could not require Mr. Parker or any other employee to produce to the company medical records to prove that his use of FMLA leave was proper.

CSX had a legitimate tool to obtain medical evidence relating to an employee's use of FMLA leave, and CSX chose not to use the tool. The procedure is called recertification. By regulation, if an employer has "information that casts doubt upon the employee's stated reason for the absence or the continuing validity of the certification," then the employer may demand recertification of a serious medical condition that warrants FMLA leave. 29 C.F.R. § 825.308. "For example, if an employee is on FMLA leave for four weeks due to the employee's knee surgery, including recuperation, and the employee plays in company softball league games during the employee's third week of FMLA leave, such information might be sufficient to cast doubt upon the continuing validity of the certification allowing the employer to request a recertification . . . ." 29 C.F.R. § 825.308(c)(3). "As part of the information allowed to be obtained on recertification for leave taken because of a serious health condition, the employer may provide the health care provider with a record of the employee's absence pattern and ask the health care provider if the serious health condition and need for leave is consistent with such a pattern." 29 C.F.R. § 825.308(e).

CSX's written FMLA policy addresses recertification.  The policy provides:

> CSX may ask you to recertify your need for FMLA leave under the
> following circumstances:  1) If you request an extension of your leave;
> 2) the circumstances described by your previous medical certification
> have changed significantly; or 3) CSX receives information that casts
> doubt upon either the stated reason for absence or the continued validity
> of the medical certification.

(Doc. 44-3, pp. 101, 104) (effective March 9, 2017).  CSX's hearing officers did not

understand recertification, (Doc. 44-3, p. 91), but Ms. Johnson and Ms. Anderson

either understood or should have understood the recertification process described in

CSX's FMLA policy.[21]

---

[21] Although his second 12-month period of FMLA leave did not expire until September of 2017, (Doc. 44-3, p. 76), Mr. Parker recertified his need for FMLA leave in June of 2017 to update Mrs. Parker's medical information.  Recall that in March of 2017, after Mr. Parker used FMLA leave over the Martin Luther King, Jr. and Super Bowl weekends, CSX advised him that the company had noticed an "established pattern of marking off FMLA leave on the weekends, in conjunction with other days off (i.e. rest days, vacation days, etc.), holidays or other pattern . . . ."  (Doc. 37-2, p. 25).  The March 2017 warning was a "**final warning**" in which CSX stated that if Mr. Parker "continue[d] misusing FMLA," he might "be subject to a charge and formal disciplinary handling. The Company will continue to monitor your FMLA mark offs."  (Doc. 37-2, p. 25) (emphasis in CSX document).  CSX explained to Mr. Parker that "[i]f there are extenuating circumstances that may support your pattern use described in this letter, you may provide Ms. Johnson with supporting documentation by emailing the information to her . . . ."  (Doc. 37-2, p. 25). Instead of waiting to renew his FMLA leave in September of 2017, Mr. Parker reapplied for leave in June of 2017 and submitted Dr. Moore's medical certification.  Mr. and Mrs. Parker authorized CSX to contact Dr. Moore if the company had questions about Mrs. Parker's serious health condition.  (Doc. 37-3, pp. 62–64).  Jurors may find from this evidence that Mr. Parker did precisely what CSX asked in March of 2017 and updated his FMLA certification with supporting documentation, but CSX turned a blind eye to this information during its investigation.

Had CSX requested recertification after Mr. Parker used FMLA leave on December 23, 24, 25, or 31 or on any other holiday in 2017, Mr. Parker would have had to "provide the requested recertification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." 29 C.F.R. § 825.308(d). CSX chose not to use recertification to investigate Mr. Parker's use of FMLA leave over the 2017-18 holiday season. And on each of the other previous occasions on which CSX warned Mr. Parker specifically or CSX employees generally that it was suspicious of FMLA leave on holidays, CSX did not seek recertification of Mr. Parker's intermittent FMLA leave to dispel or confirm the company's suspicions. (Doc. 44-3, pp. 86–87).[22]

---

[22] CSX argues that the terms of its collective bargaining agreement with Mr. Parker's union precluded it from using recertification before charging Mr. Parker. The collective bargaining agreement provides that CSX must notify an employee within 10 days from the date of an occurrence whether it will hold a disciplinary hearing. (Doc. 37-1, p. 11). The hearing must take place not less than five days and not more than 10 days after the date of the notification. (Doc. 37-1, p. 11). But CSX could have requested a recertification on December 1, 2017 after Mr. Parker used FMLA leave on October 31, November 11, and November 23 (and on a host of other days). Had Dr. Moore indicated then that Mr. Parker's FMLA use was not consistent with Mrs. Parker's serious health condition, then CSX would have had a legitimate basis to charge Mr. Parker for his next use of FMLA leave on a holiday. And Dr. Heligman effectively launched a recertification in 2018 when he attempted to reach Dr. Moore to ask if Mr. Parker's leave over the holidays was legitimate. The collective bargaining agreement did not hinder his effort. In any event, CSX's argument goes to the weight of the recertification evidence.

Moreover, in the letter setting Mr. Parker's first hearing, CSX did not ask him to bring to the hearing medical records to support his FMLA leave. CSX's witness at the hearing, Ms. Anderson, testified that no one had asked Mr. Parker for information about his leave before the hearing. (Doc. 44-2, p. 93, tp. 37). During the hearing, the hearing officer did not ask Mr. Parker a single question about Mrs. Parker's serious health condition so that he might try to understand why Mr. Parker was authorized to use FMLA leave. CSX's hearing officer made no effort to explore the symptoms or consequences of Ms. Parker's "episodes" or the reason why Mr. Parker marked off to assist his wife. There is no evidence in the record that the hearing officer had medical training or knowledge about dysautonomia or POTS. *Poitras v. ConnectiCare Inc*., 206 F. Supp. 3d 736, 747 (D. Conn. 2016) (finding that fact issues precluded summary judgment on employer's "honest belief" defense to FMLA interference claim where employer "did not research" employee's "medical condition or the details surrounding her need for medical leave").

The hearing officer assumed from a question Mr. Brock asked of Ms. Anderson that Mr. Parker took his wife to the hospital on Christmas day because she needed treatment. After Ms. Anderson testified that she was not disputing that Mrs. Parker may have been experiencing an episode on December 23, 24, and 25, (Doc. 44-2, p. 97, tp. 41), Mr. Brock pointed out that CSX did not know that "Mr. Parker spent Christmas Day in the emergency room with his wife." (Doc. 44-2, p. 102, tp.

46). Working from his understandable but inaccurate assumption, the hearing officer had the following exchange with Mr. Parker:

> Mr. Pacey: Mr. Brock had made mention in Miss Anderson's cross examine that your wife may have had an episode and then went to the hospital during Christmas, or Christmas Eve, Christmas Day?
>
> Mr. Parker: I was at the hospital.
>
> Mr. Pacey: So you were with your wife at the hospital?
>
> Mr. Parker: Yes.
>
> Mr. Pacey: I guess that's kind of…
>
> Mr. Parker: Yes.
>
> Mr. Pacey: … question I'm asking. But do you have documentation for that?
>
> Mr. Parker: Yes.
>
> Mr. Pacey: Do you have documentation you want to present to the Company so?
>
> Mr. Parker: No, I don't have it with me.

(Doc. 37-4, pp. 66–67, tpp. 50–51). When the hearing officer asked Mr. Parker why he did not bring medical evidence with him to the hearing to defend his use of FMLA leave over Christmas, overlooking the fact that CSX could not require Mr. Parker to provide medical documents substantiating his wife's episodes, Mr. Parker explained that when CSX initially removed him from service, the company refused to tell him why he was removed, and it was too late to gather documents once CSX gave him notice of the basis for his charge. (Doc. 37-4, pp. 69–70, tpp. 53–54).

Mr. Parker's statement that he was with his wife in the hospital on Christmas Day (really, Christmas night) was accurate, and he was there pursuant to his FMLA authorization because Mrs. Parker was having an episode and could not drive the Parkers' daughter to the hospital for treatment when she had a seizure. Hospital records from Mr. Parker's Christmas Day trip to the hospital would not have satisfied CSX's hearing officer or the CSX administrators who decided to terminate Mr. Parker because those records address only Mr. Parker's daughter's seizure. CSX would have understood why Mr. Parker had to drive his daughter to the hospital only if CSX had tried to understand Mrs. Parker's serious medical condition. There is no evidence that either the hearing officer or the CSX employees who made the final employment decisions regarding Mr. Parker reviewed the medical certification for Mr. Parker's intermittent FMLA leave.

Had the hearing officer reviewed Mr. Parker's medical certification for intermittent leave or attempted to understand Mrs. Parker's serious medical condition, he would have understood that, absent an emergency room trip for her own treatment, Mrs. Parker would not have a medical record dated for a holiday. Common sense and experience will tell jurors that physicians do not have office hours on holidays, so CSX employees typically will not have medical records dated for holidays. Dr. Vaughn, one of Mrs. Parker's physicians, explained that during an episode, Mrs. Parker would feel dizzy and nauseous, and her heart rate would spike.

(Doc. 44-6, p. 7, tpp. 19–20). Dr. Vaughn stated that Mrs. Parker was not supposed to visit the doctor for each episode. Instead, she was supposed to follow the treatments that her doctor ordered during routine visits. (Doc. 44-5, p. 8, tpp. 22–23). From this evidence and based on common sense, jurors could find it unreasonable for CSX to demand that Mrs. Parker or anyone else have medical records dated for a holiday episode of a chronic illness.

After the January 16 hearing, Mr. Parker collected medical records that demonstrated that Mrs. Parker was experiencing severe POTS and dysautonomia symptoms in December 2017 and January 2018. Mr. Parker presented those documents at his February 1 hearing. A January 31, 2018 letter from Dr. Vaughn stated that Mrs. Parker "had a series of incapacitating episodes throughout the month of December 2017 and January 2018. These episodes have required monitoring, physician care and hospitalization." (Doc. 37-5, p. 41). Dr. Vaughn explained: "While having an episode, [Mrs. Parker] is unable to safely do everyday tasks (i.e. drive, maneuver stairs, walk to and from her bed to the bathroom, etc.) without [Mr. Parker's] help. She has had recurring blackouts and constant vertigo." (Doc. 37-5, p. 41).

A December 7, 2017 record indicated that Dr. Moore restricted Mrs. Parker's driving because she (Mrs. Parker) blacked out while she was driving on December 6, 2017. (Doc. 37-14, p. 37). Dr. Moore ordered an EKG and placed Mrs. Parker

54

on a Holter monitor.  (Doc. 37-14, p. 37).[23]  She directed Mrs. Parker to get an IV of fluid when she returned to work at MedHelp, and she instructed Mrs. Parker to return to see her in three to four weeks.  (Doc. 37-14, p. 37).  Mrs. Parker was hospitalized on January 4, 2018 because her tachycardia was so severe.  (Doc. 37-14, p. 33).  In her January 4, 2018 medical record, Dr. Moore wrote that Mrs. Parker's POTS symptoms had been "worse over the last few weeks."  (Doc. 37-14, p. 32).  Jurors could find from this evidence that Mrs. Parker was experiencing those symptoms on December 24, 25, and 31, 2017, well within a few weeks of January 4, 2018.

CSX's Chief Medical Officer, Dr. Heligman, was not satisfied with these documents because the records that Mr. Parker provided did not specifically "reference Mrs. Parker's condition over Christmas or New Year's."  (Doc. 39, p. 18).  When asked at Mr. Parker's second hearing what type of documents Mr. Parker could have submitted "to make it a valid FMLA layoff during a holiday or weekend," Ms. Johnson replied, "I cannot state what needs to be provided."  (Doc. 44-3, p. 73, tp. 24).

---

[23] "The Holter monitor is a type of portable electrocardiogram (ECG).  It records the electrical activity of the heart continuously over 24 hours or longer while you are away from the doctor's office."  JOHNS HOPKINS MEDICINE, *Holter Monitor*, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/holter-monitor (last visited July 16, 2021).

CSX had Mrs. Parker's December 7, 2017, January 4, 2018 and January 31, 2018 medical records when it made the decision to fire Mr. Parker the first time on February 15, 2018. The company had the records when it decided to fire Mr. Parker the second time on March 2, 2018. The company had those records when an arbitration board in March of 2019 stated that the record "lack[ed] any documentary evidence in support of claimant's position that his FMLA layoff was defensible under FMLA policy and the conditions of his FMLA leave." (Doc. 37-1, p. 58). Jurors could conclude that CSX saw only what it chose to see in Mrs. Parker's medical records and unreasonably demanded more precise medical documentation from Mr. Parker.

* * * * *

Thus, there is disputed evidence as to each justification CSX has offered for its decision to terminate Mr. Parker in conjunction with his use of FMLA leave over the 2017-18 holiday season. The hearing officer in Mr. Parker's first hearing based his finding of FMLA misuse at Christmas on a single factual finding: "Parker admitted he was off FMLA for the Christmas Holidays." (Doc. 44-12, p. 46). Mr. Jones was convinced that Mr. Parker used FMLA leave dishonestly over the 2017-18 holiday season, but to fire an employee for his use of FMLA leave, an employer must have conducted a reasonable investigation to support the finding that an employee misused leave. The record here contains disputed questions of fact

concerning the reasonableness of CSX's investigation of Mr. Parker's use of FMLA leave over the holidays. Those questions are for a jury to resolve at trial. *See Lowe*, 244 F.3d at 1309 (finding question of fact regarding the employer's assessment underlying asserted good faith belief); *Poitras*, 206 F. Supp. 3d at 747 (finding that fact issues precluded summary judgment on employer's "honest belief" defense to FMLA interference claim); *Hooks v. Lockheed Martin Skunk Works*, 14 Fed. Appx. 769, 772 (9th Cir. 2001) (holding in Title VII race discrimination case that "[a] 'sham' investigation can be evidence of a company's lack of good faith efforts to comply with anti-discrimination laws" but ultimately concluding that employer's investigation was adequate) (citing *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 860–61 (7th Cir. 2001)); *see generally Benz*, 732 Fed. Appx. at 804 ("The foregoing evidence, when viewed in the light most favorable to Benz, creates a triable issue as to whether Crowley terminated Benz in retaliation for requesting FMLA leave.").

## FMLA Interference

To establish an FMLA interference claim, "a[] [plaintiff] need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland*, 239 F.3d at 1206–07. Under the FMLA, an eligible employee has the right to "a total of 12 workweeks of leave during any 12–month period" to care for a spouse who has a "serious health condition" and the right following leave "to be restored by the employer to the position of employment held by the employee

when the leave commenced" or to "an equivalent position." 29 U.S.C. § 2612(a)(1)(C); 29 U.S.C. § 2614(a)(1); *Strickland*, 239 F.3d at 1206.

Here, Mr. Parker used FMLA leave over Christmas 2017 and New Year's Day 2018. CSX restored Mr. Parker to his position as a train conductor after he returned from FMLA leave over the 2017-18 holidays and after every other occasion on which he used FMLA leave. CSX did not remove Mr. Parker from service for alleged FMLA misuse until January 2, 2018. (Doc. 44-5, p. 20). Therefore, Mr. Parker has not demonstrated that CSX denied him a benefit to which he was entitled under the FMLA.

Mr. Parker's interference theory is not really that CSX prohibited him from taking FMLA leave but that CSX disciplined him for doing so. Therefore, Mr. Parker's FMLA interference claim is "essentially the same as" and "is largely a clone of [his] FMLA retaliation claim." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 Fed. Appx. 831, 841 (11th Cir. 2015). The Court already has addressed Mr. Parker's retaliation claim.

Mr. Parker argues that CSX's 4-in-10 FMLA policy limits the number of holidays during which an employee may use FMLA leave. (Doc. 46, pp. 32–34). Perhaps, but the test did not limit his use of FMLA leave, and he does not have standing to assert claims for other CSX employees. Because Mr. Parker has not

demonstrated that he was deprived of a benefit to which he was entitled under the FMLA, CSX is entitled to judgment on his FMLA interference claim.

## Outrage

Mr. Parker asserts a claim against CSX under Alabama law for the tort of outrage. "The tort of outrage is an extremely limited cause of action." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). As the Alabama Supreme Court has explained:

> It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey,* 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen,* 447 So.2d 133 (Ala.1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.,* 551 So.2d 322 (Ala.1989). See also Michael L. Roberts and Gregory S. Cusimano, *Alabama Tort Law,* § 23.0 (2d ed.1996). In order to recover, a plaintiff must demonstrate that the defendant's conduct '(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.' *Green Tree Acceptance, Inc. v. Standridge,* 565 So.2d 38, 44 (Ala.1990) (citing *American Road Service Co. v. Inmon* [, 394 So.2d 361 (Ala.1980) ] )."

> *Potts v. Hayes,* 771 So.2d 462, 465 (Ala.2000). That is not to say, however, that the tort of outrage is viable in only the three circumstances noted in *Potts.* Recently, this Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction. *See O'Rear v. B.H.,* 69 So.3d 106

(Ala.2011). It is clear, however, that the tort of outrage is viable only when the conduct is "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Horne v. TGM Assocs., L.P.,* 56 So.3d 615, 631 (Ala. 2010) (quoting *Inmon,* 394 So.2d at 365).

*Little v. Robinson*, 72 So. 3d 1168, 1172–73 (Ala. 2011).

Mr. Parker's evidence is not sufficient to warrant submission of his outrage claim to a jury. Viewed in the light most favorable to Mr. Parker, CSX fired him because he used FMLA leave. Viewing the evidence in the light most favorable to Mr. Parker, he can establish that CSX's arbitrary test caused him to be pulled from service and that CSX's failure to properly investigate his use of FMLA led to his wrongful termination. But Mr. Parker has not presented evidence of conduct so outrageous that it goes beyond all bounds of decency so as to warrant a new category of outrage claim under Alabama law. "[I]f the tort of outrage were recognized under the circumstances alleged in this case, it would mean that the tort of outrage would exist in every . . . case when an employer . . . discriminates or retaliates against a[n] . . . employee—a result not consistent with the 'extremely limited' nature of the tort of outrage in Alabama." *Estate of Reed v. Ponder Enters., Inc.*, No. 1:11-cv-554-CSC, 2012 WL 1031487, at *8 (M.D. Ala. Mar. 27, 2012) (citing *Little*, 72 So. 3d at 1172).

Accordingly, the Court will enter judgment in favor of CSX on Mr. Parker's outrage claim.

## Negligent/Wanton Training and Supervision

Mr. Parker alleges that CSX negligently or wantonly trained and supervised the employees, supervisors, and management who were involved in his termination. (Doc. 14, pp. 13–16). CSX has asked the Court to enter judgment in its favor on these claims because under Alabama law "[a] negligent training or supervision claim requires proof that the defendant committed a state-law tort; a violation of federal law is not sufficient." (Doc. 39, p. 42) (citing *Shuler v. Ingram & Assocs.*, 441 Fed. Appx. 712 (11th Cir. 2011)).

In *Shuler,* the Eleventh Circuit stated that the plaintiffs' "wanton and reckless supervision and training claim fail[ed] as a matter of law because they [] failed to establish that Ingram's employees committed any tort under Alabama law—including fraud, invasion of privacy, or defamation—as discussed above." *Shuler v. Ingram & Assocs.*, 441 Fed. Appx. at 721. The same is true here. Because the Court has concluded that CSX did not commit the tort of outrage, and because Mr. Parker does not allege another underlying state-law tort against CSX's employees, the Court will enter judgment in favor of CSX on Mr. Parker's negligent/wanton training and supervision claims.

## Conclusion

For the reasons discussed above, the Court grants CSX's motion for summary judgment as to Mr. Parker's FMLA interference claim, his outrage claim, and his claims for negligent/wanton training and supervision. Because the Court has reconsidered its initial ruling on Mr. Parker's FMLA retaliation claim *sua sponte*, if it wishes, CSX may file a supplemental brief regarding FMLA retaliation of no more than 15 pages by July 28, 2021. If CSX files a supplemental brief, then Mr. Parker may respond by August 4, 2021.

**DONE** and **ORDERED** this July 16, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE